**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **BLACK VETERANS PROJECT and NATIONAL VETERANS COUNCIL FOR LEGAL REDRESS.** | |
| *Plaintiffs*, | Case No.  3:21-cv-00935 (VLB) |
| **v.** | |
| **U.S. DEPARTMENT OF VETERANS AFFAIRS,** | |
| *Defendant*. | **FEBRUARY 25, 2022** |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs brought this action against the Department of Veterans Affairs ("VA") asserting claims under the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552, as amended.  At this time, Defendant has conducted a search reasonably calculated to lead to responsive records, has answered all of Plaintiffs' FOIA requests and produced to Plaintiffs all non-exempt, segregable documents subject to FOIA.  As there are no material facts in dispute, Defendant respectfully moves this Court pursuant to Rule 56, FED. R. CIV. P., for summary judgment as to all claims asserted in this action.

**FACTUAL BACKGROUND**

Plaintiffs, the Black Veterans Project, and the National Veterans Council for Legal Redress, are organizations that support Black service veterans and provide education on issues facing Black veterans.  Complaint, ECF 1, ¶¶ 3-4.  They made

the FOIA requests in this case to "shed light on the racial disparities across the VA benefits system." Complaint at 2.

There are three sets of FOIA requests in this case, all dispatched on February 22, 2021. The first set is 16 requests directed to the Veterans Benefits Administration ("VBA"). Complaint, Attachment A. The VBA oversees a variety of benefits and services to veterans and their families, including veterans' disability compensation.

The second set is six requests directed to the Veterans Health Administration ("VHA"), the healthcare and hospital system for veterans. Complaint, Attachment B; *see* https://www.va.gov/health/.

The third set of FOIA requests is five requests directed to the Board of Veterans' Appeals ("BVA"), which is a staff office within the VA Central Office. *See* Complaint, Attachment C. The BVA adjudicates administrative appeals from determinations of veterans benefits. BVA Members are also known as Veterans Law Judges. 38 C.F.R. § 20.101.

Since the filing of the Complaint, the parties have conferred regularly, usually by telephone, but also by email, in an effort to narrow the issues. As described in the accompanying declarations, the VA has continued to search, clarify, and produce records during the pendency of this case.

There are only nine FOIA requests still in dispute: VHA Items 1, 2, 3, 4, and 6; VBA Items 15 and 16; and BVA Items 4 and 5. Plaintiffs have agreed that the other 18 requests are fully satisfied and are no longer at issue in this case.

Defendant hereby incorporates in full its Statement of Undisputed Material Facts, the declarations of the following FOIA Officers and subject matter experts: 1) Heim; 2) Hamner; 3) Akins; 4) Hart; 5) G. Draves; 6) D. Wood; 7) Nadal; 7) Suppa; 8) Stephens; 9) Hawrylciw; 10) Charlebois; 11) Gosnell; 12) Wagner; 13) Caines; 14) Cunningham; and 15) Parise, as well as all the exhibits and attachments referenced and included therein.

## LEGAL STANDARD

FOIA disputes are generally resolved by summary judgment. *See, e.g., Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment is warranted if a movant shows "there is no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)). Only disputes over facts that are material will preclude the entry of summary judgment. *See Id.*

To show that a material fact cannot be genuinely disputed, a moving party must "cit[e] to particular parts of materials in the record," which include depositions, affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials. *See* Fed. R. Civ. P. 56(c)(1)(A). If the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380. Where a party fails to address another party's assertion of fact, the court may consider it undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2017).g

## ARGUMENT

**DEFENDANT CONDUCTED A REASONABLE SEARCH FOR RESPONSIVE INFORMATION AND PROPERLY APPLIED FOIA EXEMPTIONS TO THE INFORMATION RELEASED IN REPONSE TO PLAINTIFFS' FOIA REQUESTS.**

I.   **Defendant's Search was Reasonably Calculated to Lead to the Discovery of Responsive Documents.**

On a motion for summary judgment in a FOIA action, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 231 (D. Conn. 2012); *Carney v. U.S. Department of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B); *EPA v. Mink*, 410 U.S. 73, 79 (1973)).

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records. *Protect our Defenders v. DOD*, 401 F. Supp. 3d 259, 271 (D. Conn. 2020) (citing *Morley v. CIA*, 508 F.3d 1108, 1114, 378 U.S. App. D.C. 411 (D.C. Cir. 2007). An "adequate" search under FOIA is

4

"reasonably calculated to discover" documents responsive to the FOIA request. *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). "[T]he search need only be reasonable; it does not have to be exhaustive." *Miller v. Dept. of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) (citing *National Cable Television Association v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).

This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce relevant material. *See N.Y. Times Co. v. Department of Justice*, 756 F.3d 100, 124 (2d Cir. 2014). The fundamental question is not "whether there might exist any other documents responsive to the request, but rather whether the search for those documents was adequate." *Steinberg v. Dept. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dept. of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located. [Oglesby, 920 F.2d at 68.] Simply stated, the adequacy of the search is "dependent upon the circumstances of the case." *Truitt v. Dept. of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

In the event that an agency does not find the requested information, the Supreme Court has squarely held that the FOIA does not require agencies to create documents or explanatory material." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 162 (1974); *see* 5 U.S.C. § 552; *see also, e.g., Borom v. Crawford*, 651 F.2d 500, 501 (7th Cir. 1981) (FOIA does not require the compilation of statistical data).

To show that an agency satisfied its FOIA obligations, the agency may rely on affidavits or declarations, so long as they are relatively detailed, nonconclusory, and submitted in good faith.  *Wood v. F.B.I.*, 432 F.3d 78, 85 (2d Cir. 2005).

A.      **VHA Conducted a Search Reasonably Calculated to Lead to the Discovery of the Information Requested by Plaintiffs.**

The declarations accompanying this motion more than fulfill the requirements to show an adequate search.  A declaration in support of the reasonableness of a search should explain "the search terms and the type of search performed, and aver[ ] that all files likely to contain responsive materials ... were searched." *Gonzalez v. United States Citizenship & Immigr. Servs.*, 475 F. Supp. 3d 334, 347 (S.D.N.Y. 2020)(citing *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-314 (D.C. Cir. 2003) (citation and internal quotation marks omitted)). The declaration need not "set forth with meticulous documentation the details of an epic search." *Id.* (citing *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982) (per curiam)).  Also, affidavits submitted by an agency to establish its FOIA compliance are accorded a presumption of good faith.  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d at 489.

The very first sentence on VA's FOIA request webpage is the following: "The VA has a decentralized system for fulfilling FOIA requests. The type of information or records you are seeking will determine the location to which you should submit your request."  *Freedom Of Information Act FOIA Requests*, Department of Veterans Affairs, available at  https://www.va.gov/foia/Requests.asp.

VA's FOIA regulations inform all requesters that if they are "requesting records from a particular medical facility or regional office, for example, the request should be sent to the FOIA Office at the address listed for that component." 38 C.F.R. § 1.554(a).  In addition, VA regulations remind requesters that "[a] list of FOIA contacts is available on the Internet." *Id.*

 VA's Veterans Health Administration (VHA) is "America's largest integrated health care system, providing care at 1,293 [facilities]" as documented by VA's official VHA website at: https://www.va.gov/health/aboutvha.asp.  *Veterans Health Administration* (Sept. 28, 2021).  In this litigation, however, Plaintiffs chose to make a multi-item FOIA request to VHA demanding a search "… not limited to, medical centers, community-based outpatient clinics, and Vet Centers from 2001 to the present."  Purposefully, Plaintiffs bypassed making a request at each of VHA's healthcare facilities so that VHA Central Office FOIA would conduct and coordinate an extensive and all-inclusive search of VHA's almost 1,300 facilities for them.  This lunacy did not occur.  Instead, VHA Central Office FOIA, in adherence with VA regulations, conducted a very reasonable search of national program offices and those offices within VHA Central Office FOIA.  OGC's Final Agency Decision and Response to Plaintiffs' Appeal of the IAD[1] for FOIA Request 21-03677-F, Exhibit E at 3.

An agency need not conduct a search that plainly is unduly burdensome. *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999) (citing *Ruotolo v. Department of*

---

[1] IAD refers to Initial Agency Decision.  This is the vehicle that the VA uses to formally respond to a FOIA request.

*Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir.1995)). For example, it unreasonably burdensome to require a search of the files of over 5,000 criminal cases upon a general request for data to be gleaned from documents which have not been created. *Ruotolo*, 53 F.3d at 9 (citing *Krohn v. Dep't of Justice*, 628 F.2d 195, 198 (D.C. Cir. 1980)). "[T]here are limits to the lengths to which an agency must go in responding to a FOIA request." *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 664 (D.C. Cir. 2003). For example, in *Schrecker*, the D.C. Circuit held that the agency need not conduct further searching by cross-referencing responsive material against non-responsive material, even if the process could be automated, as such an effort went beyond the reasonableness required by FOIA and was "onerous" for the agency. *Id.*

In this case, propagating the Plaintiffs' search requests down to each of the VA's nearly 1300 healthcare facilities (plus administrative offices) is clearly an unreasonably burdensome search that goes beyond the requirement of FOIA. *See, e.g., Am. Fed'n of Gov't Emps., Loc. 2782 v. U.S. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990) (request need not be replicated in each of the 356 offices of the Census Bureau).

VHA Central FOIA Office's reasonable search, calculated to obtain as much information for Plaintiffs without performing a facility-by-facility search is established by 1) the numerous inquiries and sub-assignments made by the VHA Central FOIA Office to find the best source of information for Plaintiffs; 2) the detailed declarations of the FOIA Officers and subject matter experts who searched

8

for Plaintiffs' data; and 3) VA's existing FOIA regulations which set the parameters for the search by VHA Central FOIA Office.

These searches, indeed, all the searches in this case are best appreciated in the context of the breadth and scope of the FOIA function within VA. The FOIA log for Fiscal Year 2022 alone is 507 pages long, and shows the range and complexity of requests that the VA receives at the rate of about 20,000 requests per year. *See* FOIA Log FY 2022 available at https://www.va.gov/FOIA/docs/Updated_Documents/FOIA_Logs/FY2022_FOIA_LOG.pdf; *see also* FOIA Annual Reports available at https://www.va.gov/foia/Library.asp. (Note that the simple requests, say, for a veteran's own record, are often turned around in one to three days.) According to the Congressional Budget Office (with whom the VA does not necessarily agree), an investment of $22M would be necessary to address backlogs and bring the VA into baseline compliance with FOIA turnaround for 2021-2025. *Cost Estimate, H.R. 7163, VA FOIA Reform Act of 2020*, Congressional Budget Office (Nov. 18, 2020) available at https://www.cbo.gov/publication/56779. A canvass of the sixteen declarations accompanying this motion illustrates the resources required to respond to complex requests like these. Many of these personnel do not ordinarily have FOIA processing as part of their day-to-day duties, and set those responsibilities aside in order to apply their expertise to responding to FOIA.

1. **VHA Conducted a Search Reasonably Calculated to Lead to the Discovery of Responsive Patient Discrimination Complaints, Investigations and Materials Regarding the Same. (VHA #1 - 3)**

In its search for patient race or racial bias discrimination complaint data, investigations into systemic, widespread, persistent, or pervasive racial discrimination at VHA healthcare facilities, as well as investigative reports and investigative policy, the VHA FOIA Officer logically referred Plaintiffs' VHA FOIA Request to the National Program Manager for VHA's Office of Patient Advocacy. Heim Exh. B Decl. ¶ 25. Hamner Decl. Exh. D ¶ 12. VHA's Office of Patient Advocacy (OPA) documents patient concerns from all VHA facilities. *Id.* at ¶¶ 17, 19. At the request of the VHA FOIA Officer, the VHA's National Program Manager searched OPA's patient advocacy tracking system. He personally searched both Legacy PATS and PATS-R databases for discrimination complaints. *Id.* ¶¶ 12.

The Legacy PATS and PATS database searches did not produce responsive records to Plaintiffs' request, which sought complaints of racial bias. Heim Decl. Exh. B, Attach. 1; OGC's Final Agency Decision and Response to Plaintiffs' Appeal of the IAD for 21-03677-F (July 7, 2021), Exh. E. The reason was simple: at the time of Plaintiffs' VHA FOIA Request, patient discrimination concerns were only documented in Legacy PATS and PATS-R databases under a generic issue code category "RI08" for "Discrimination Concerns." Hamner Decl. Exh. D ¶ 14. In other words, neither the Legacy PATS nor the PATS-R database was set up to provide the data Plaintiffs requested. *Id.*

The National Program Manager explained that OPA's Patient Advocates and Service-Level Advocates documented patient concerns but did not investigate or adjudicate allegations of patient discrimination of the kind identified in VHA request #1. *Id.* ¶¶ 18-19. Instead, these were referred to VA's External Complaints process. *Id.* ¶¶ 18-19. Thus, when the National Program Manager searched the Office of Patient Advocacy's shared drives, using key terms in the VHA request, it was not surprising that no records were found, because the intake and the investigation of discrimination complaints are not responsibilities of that office. *Id.* ¶¶ 16, 18.

Furthermore, neither the Legacy PATS and now PATS-R databases documents if a generic discrimination concern is systemic, widespread, persistent, or pervasive. *Id.* ¶ 21.

On December 16, 2021, even though a "no records" response accurately described the outcome of Legacy PATS and PATS-R and in an attempt to be helpful after a meet and confer with Plaintiffs, the VHA FOIA Officer provided Plaintiffs with what data there was to provide - an Excel spreadsheet listing the 1,057 patient concerns under the general issue code RI08 by facility and year. Heim Decl. Exh. B ¶ 35.

In the search for complaints for racial bias brought by patients or others, VHA also turned to ORMDI's External Civil Rights Discrimination Complaints Program. As mentioned above, patients' discrimination complaints are referred by VHA's OPA to ORMDI's External Complaints. Hamner Decl. Exh. D ¶¶ 18-19. In VA,

ORMDI's External Civil Rights Discrimination Complaints Program Manager is the sole employee official charged with the tracking of discrimination complaints under Title VI. Akins Decl. Exhibit N ¶¶ 5-6.  In response to the search request, the Program Manager turned over the single Excel spreadsheet used by him to track external complaints.  The Program Manager explained he used the same Excel spreadsheet used by staff before him to track external complaints. *Id.* ¶ 10.  In the External Complaints Excel tracking spreadsheet, external complaints were not categorized as systemic, widespread persistent or pervasive, so no complaints under these categories could be identified.  *Id.* ¶ 13.  In addition, the Program Manager clarified that he tracked external patient complaints of discrimination, referred the same to the corresponding Administrations, but did not track any resulting finding.  *Id.* ¶ 19.

On November 23, 2021, ORMDI released the Excel spreadsheet listing external complaints which alleged race discrimination, as well as with those patient complaints where a discrimination basis could not be ascertained.  Stephens Decl. Exh. O ¶ 6.  The spreadsheet was released in its entirety except for the first and last names of the complainant, pursuant to Exemption 6.  In its November 23, 2021, IAD, ORMDI explained to Plaintiffs that that some data in ORMDI's External Complaints (referred to in the in the IAD as "affairs"), had been destroyed according to the requirements of its records retention schedule.  Stephens Dec. Exh. O, Attachment 1, at 1-2.

Although the Program Manager for ORMDI's External Complaints program is not tasked with investigating patients' discrimination complaints, he did search that program's files for records responsive to VHA request #2, which sought policies for investigating and adjudicating individual complaints of racial bias or discrimination at VHA health care facilities. *Id*. ¶ 24. On February 7, 2022, the Program Manager forwarded the one responsive document he found, an Office of Resolution Management (ORM) External Complaints Processing SOP (Standard Operating Procedure), for FOIA processing and possible release. *Id.* The SOP was then released to Plaintiffs on February 9, 2022. Stephens Decl. Exh. O ¶ 7. In the end, Plaintiffs received all the aggregate data ORMDI had fitting Plaintiffs' criteria for external complaints, along with the existing SOP. *Id.*

In a further effort to find responsive information to Plaintiffs' request for either aggregate discrimination complaint data or investigations of systemic, widespread, pervasive, or persistent discrimination, other investigative VA programs were also contacted. On February 24, 2021, the VHA FOIA Officer referred Plaintiffs' VHA FOIA Request to VA's Office of Inspector General (OIG) FOIA Office. In response, the OIG advised that the request was not under the OIG's purview. Heim Decl. Exh. B ¶ 25-26.

OGC contacted the FOIA Officer of VA's Office of Accountability and Whistleblower Protection (OAWP). Guimont Decl. Exh. F ¶ 4. OAWP explained that although it investigated senior leaders for poor performance and/or misconduct, the OAWP database did not have a way to categorize these cases under an EEO

basis such as "race" or "racial bias." *Id.* ¶ 6. OAWP's database also has no way to track investigations as being systemic, widespread, persistent, or pervasive. *Id.* Lastly, VA employees who contacted OAWP with discrimination complaints were referred to VA's Office of Resolution Management Diversity and Inclusion. *Id.* ¶ 7.

As to the search related to patient discrimination complaints data, as well as systemic widespread investigations and investigative policies, there should be no material doubt that VHA's Central FOIA Office's search was reasonably calculated to lead to the discovery of responsive information. Aggregate patient complaint data was in fact provided to Plaintiffs from national VA programs: the PATS data from VHA's Office of Patient Advocacy and the tracking spreadsheet from ORMDI's External Civil Rights Discrimination Complaints Program. In addition, both programs confirmed they were not charged with complaint investigations nor categorized any complaints as being systemic, pervasive, widespread, or persistent. Because FOIA does not require agencies to create new records for FOIA requesters and the results of this reasonable search for patient discrimination complaint data have already been provided to Plaintiffs, VHA should be granted summary judgment.

      2.      **VHA Conducted a Search Reasonably Calculated to Lead to the Discovery of Responsive Employee Complaint Data. (VHA #1, 3, 4)**

With respect to records of VHA employee complaints and EEO-specific trainings, VHA's Central FOIA Office referred the relevant portion of Plaintiffs' requests to VA's Office of Resolution Management, Diversity & Inclusion (ORMDI).

ORMDI is charged with the investigation of all VA employees' equal employment opportunity complaints.  Heim Decl. Exh. B ¶ 16.  ORDMI's search for records immediately led to the ORMDI FOIA Officer contacting the manager of the Office of Quality and Performance to query the Complaints Automated Tracking System (CATS).  The intended query was an initial search for items 1 and 3 of the VHA FOIA Request, which sought VHA employee discrimination complaint data.  Hawrylciw Decl. Exh. L ¶ 5.  From her personal knowledge and experience performing data requests, the Office of Quality and Performance manager knew CATS was the database that housed the VHA employee discrimination complaint data requested by Plaintiffs.  *Id.*  ¶ 6.  The Office of Quality and Performance team used third party software, SAP Crystal Reports, to query the CATS database to respond to Plaintiffs' request. *Id.* ¶ 14.  The Office of Quality and Performance Manager further explained that her "team used this search method because SAP Crystal Reports is the primary software for our CATS database."  *Id.* ¶ 16.  All EEO discrimination complaint data that was retrieved was released to Plaintiffs in full 21 pages.  Suppa Decl. Exh. K Attachment 1.

As clarified by the Office of Quality and Performance manager who works with the EEO data, the CATS database includes a listing on only 242 VHA stations (not the oft-quoted 1300 VHA facilities number).  Hawrylciw Dec. Exh. L ¶ 8.  This is because the CATS database captures all "parent" facilities, such a VISNS (regional offices) or full-fledged medical centers.  *Id.* ¶ 9.  When there is an employee discrimination complaint at a smaller or "child" station, such as

community-based outpatient clinics (CBOCs) or Veteran Centers, these are tracked in CATS under their parent station (or if there is an administrative reason, under another station).  *Id*. ¶ 10.  In other words, EEO complaints from child locations were not missing from the data provided to Plaintiffs.  As part of the search of CATS by ORMDI's Office of Quality and Performance, the manager verified that CATS did not track employee EEO discrimination complaints under subcategories indicating that the employee complaints were "systematic, wide-spread, persistent or pervasive."  Hawrylciw Dec. Exh. L ¶ 17.

ORMDI also conducted a further search for investigative materials.  The ORDMI FOIA Officer informed OGC that some complaint decisions under the EEOC are handled by Office of Employment Discrimination and Complaint Adjudication ("OEDCA").  Suppa Decl. Exh. K ¶ 30.  This ensuing search resulted in a supplemental document release of a 420-page OEDCA Policies and Procedures document to Plaintiffs on January 16, 2022.  Parise Decl. Exh. T ¶ 10.  ORMDI also released its ORM-Handbook (SOP)-5977.1 (76 pages) and ORM EEO Investigators Guide, Jan. 2018 (120 pages).  Stephens Decl. Exh. O, Attachment 1, page 2.  Lastly, Plaintiffs were also provided with a link to all VA publications Plaintiffs as being available at https: //www.va.gov.vapubs/.

Since FOIA would not require CATS to create new records by adding new coding to capture child station information to the CATS database, a link for all VA publications was provided to Plaintiffs, the same was supplemented with policies for investigating and adjudicating  individual complaints of discrimination (ORMDI,

OEDCA and External Complaint documents), and all responsive EEO discrimination aggregate complaint data  was already released to the Plaintiffs, VHA should be granted summary judgment on this issue.

> 3.  **VHA Conducted a Search Reasonably Calculated to Lead to the Discovery of Responsive Training Data. (VHA #4)**

To obtain Plaintiffs' training data, the VHA Central FOIA Officer contacted Central Office's Human Capital Management, because she thought they might have some oversight over VHA employee training and VHA EEO guidance.  Heim Decl. Exh. B ¶ 23.  Human Capital Management administers staffing, recruitment, classification, pay and leave administration, performance management and recognition, work life and employee benefits. Human Capital then sent Plaintiffs' training request items to its Employment Education System (EES) Support Division for a search of VA's national Training Management System (TMS).  Hart Decl. Exh. C ¶ 12.  Once received, the EES Learning Manager performed a search of VA's national TMS database.  TMS currently contains approximately 170,000 available VA course listings. *Id.* ¶ 6.

On February 24, 2021, the EES division's TMS Learning Manager conducted a first search of TMS using the search terms "racial," "bias" and "discrimination," which were based on the language used by Plaintiffs in their FOIA request asking for "[any] training provided to VHA employees or volunteers related to racial bias and/or discrimination as well as how often such training had to be completed for each position at VHA from 2001 to the present." *Id.* ¶¶ 12-13.  In order to obtain the most data available for Plaintiffs, the TMS Learning Manager did not use a date

range but instead left this field open providing to Plaintiffs whatever information was available in TMS. *Id.* ¶ 14.  The TMS Learning Manager's first search retrieved 1,342 course listings.  *Id*. ¶ 14.  On April 14, 2021, the VHA Central FOIA Officer provided the TMS Excel spreadsheet with the trainings to the Plaintiffs.  Heim Decl. Exh. B ¶ 34.

In an effort to ensure VHA had a listing of all possible trainings which might be responsive to Plaintiffs' request, the TMS Learning Manager conducted a second search on August 31, 2021, adding the search terms "race," "racism," "prejudice" and "harassment."  Hart Exh. C ¶ 15.  On October 13, 2021, the TMS Learning Manager performed a third search adding the search term "systemic." *Id*. ¶ 17.  In total, the EES Learning Manager's multiple search efforts yielded 1,954 course listings which were provided to Plaintiffs in Excel spreadsheets in the original release mentioned above and as a supplemental release on December 16, 2021.  Hart Decl. Exh C ¶ 19; Heim Decl. Exh. B ¶ 35.

With respect to the underlying training content of the 1,954 course trainings, it must be made clear that VA's national TMS database does not house any training material.  Hart Decl. Exh. C ¶ 7.  It is a tracking program.  Instead, there would first have to be a search for all current unique content owners at VHA VISNs, facilities, CBOCs, program offices, suboffices, etc.  *Id.* ¶ 23.  Thereafter, each unique content owners would have to search electronic and physical files where the training might reside.  VA staff might have to conduct additional searches at their individual VISNs, facilities, CBOCs, program offices and suboffices for past training content.

Heim Decl. Exh. B ¶ 31; Hart Decl. Decl. Exh. C ¶¶ 23-25.  Having each of the 2000 trainings individually researched and retrieved is not within the scope of FOIA, as discussed above.

As far as Plaintiffs' request for training requirements, there is no global TMS field for how often a course is required to be taken by any particular employee. Hart Decl. Exh. C ¶ 30.  National training required for all VA employees uses "easy" coding because it applies to all VA employees across all facilities.  By contrast, individual learning plans are determined on a case-by-case basis and coded, if at all, according to the VHA facility, program at the facility or even by an individual. *Id*. ¶¶ 30-31.  For example,  for licensing purposes all VA nurses in a particular state may have certain requirements.  Such necessary training may be input into each students individual learning plan.

But to obtain the information being requested by Plaintiffs, the TMS Learning Manager estimates he and the EES team would have to run four (4) reports per year, per each of the approximately 350,000 VHA employees at VHA at any one time in order to extract the training requirement data. *Id*. ¶ 32.  The estimate is that it would take many weeks or many months to just extract the raw learning plan data.  *Id*. ¶ 35.  Thereafter, perhaps the same amount of time would be needed to decode the data.  *Id.*  For example, the TMS Learning Manager explained he would have no way to recognize which employees had left VHA until after he ran the reports for the individuals.  *Id*. ¶ 33.  Similarly, multiple reports would have to be run to decode which employees took any of the 1,954 trainings found through the TMS search

and what, if any, other than the trainings mandated by law, were actually *required* trainings. *Id.* ¶¶ 36-38.  This said, in its OGC July 7, 2021, response, Plaintiffs were provided with the following mandatory biennial trainings all VA employees are required to take: "Whistleblower Rights and Protections" and "Prevention of Workplace Harassment/No Fear."  OGC's Final Agency Decision and Response to Plaintiffs' Appeal of the IAD for FOIA Request 21-03677-F, Exh. E, p. 7.

Here, too, VHA Central FOIA Office left no material doubt as to the adequacy of their search by tagging the one team in charge of VA's national training TMS database.  Since FOIA does not require agencies to create new records for FOIA requesters and the data results of the training information in TMS, under the parameters provided by Plaintiffs, have been released, VHA should be granted summary judgment on this issue.

        **4.**      **VHA Conducted a Search Reasonably Calculated to Lead to the Discovery of Responsive Medical Malpractice Lawsuit Data. (VHA #5 and #6)**

For the search of responsive medical malpractice lawsuit data, VHA Central Office FOIA contacted VA's Office of General Counsel (OGC) FOIA Office and, after confirming this was the right location for a search of medical malpractice data, assigned items 5 and 6 of Plaintiffs' VHA FOIA Request.  Heim Decl. Exh. B ¶¶ 12-13; Draves Decl. Exh. G ¶ 4.

Through his years of experience with OGC, the OGC FOIA Officer knew that VA OGC's tracked medical malpractice data through OGC's national GCLaws database.  Draves Decl. Exh. G ¶ 5.  After having OGC's Informatics team search

the GCLaws database for the medical malpractice lawsuit data, Informatics provided the OGC FOIA with an Excel spreadsheet with responsive information to item 5. *Id.* ¶ 7.

As to gender and race data as sought in VHA #6, Informatics explained to the OGC FOIA Officer that GCLaws did not track the race or gender of complainants so there was no race or gender information to extract from GCLaws. *Id.* ¶ 8; *see also* Heim Decl. Exh. B ¶¶ 12-15; Nadal Decl. Exh. J ¶ 15.

On March 23, 2021, the OGC FOIA Office's paralegal sent Plaintiffs OGC's interim agency decision (IAD) with an Excel spreadsheet containing aggregate numbers for item 5 (medical malpractice by year and by facility) and a no records response for item 6 (medical malpractice cases by race and gender) of Plaintiffs' VHA requests. *Id.* ¶ 9. The OGC FOIA Officer initially received a system verification of this transmission.

However, after Plaintiffs filed their Complaint, which alleged no records release, the OGC FOIA Officer believed it was very likely the transmission of the OGC IAD had not gone through to Plaintiffs. *Id.* ¶¶ 9-10. Since the search for medical malpractice lawsuit data was now in litigation, OGC FOIA decided to re-check the search by Informatics. *Id.* ¶ 12. On August 26, 2021, the OGC Informatics team conducted another search of OGC's national GCLaws database for medical malpractice aggregate lawsuit data. Nadal Decl. Exh. J ¶¶ 5, 13. As it was the case with its first search through the first data analyst, Informatics retrieved the aggregate claims information and again explained the GCLaws database did not

track a complainant's gender or race.  Nadal Dec. Exh. J ¶ 15. Draves Decl. Exh. G ¶ 8.  On August 27, 2021, the OGC FOIA Officer re-released OGC's first IAD, the Excel spreadsheet in full to Plaintiffs showing medical malpractice claims data by facility and year for item 5, and a no records response to item number 6.  Draves Decl. Exh. G ¶ 13.

Unfortunately, OGC's effort to provide Plaintiffs with accurate data did not end in August.   On February 1, 2021, OGC confirmed that the data provided to Plaintiffs was overinclusive, because it tallied tort claims, instead of only lawsuits.  Nadal Decl. Exh. J, ¶ 16.  Therefore, Defendant immediately moved to correct this mistake and on February 3, 2022, Informatics ran another search of the GC Laws medical malpractice claims data, filtered for only the medical malpractice lawsuit data requested by Plaintiffs.  Nadal Decl. Exh. J ¶¶ 17-18.  On February 16, 2021, OGC FOIA released the corrected data to Plaintiffs in a PDF, along with a transparent explanation of its error.  Wood Decl. Exh. H ¶ 9-10.

Here, VHA Central Office FOIA logically requested a search from the Office of General Counsel, the national program tracking VHA's medical malpractice claims and lawsuit data.  Race or gender data of the patient might or might not exist somewhere in each individual litigation file.  But this information is not tracked by the OGC GCLaws database.  File-by-file manual examination of OGC's medical malpractice lawsuit files would be necessary to try to discern the race or gender identification of the patient.   Such a herculean task is not required by FOIA.  It is black-letter law that FOIA does not require agencies to conduct research.  *Nat'l*

*Sec. Couns. v. C.I.A.*, 898 F. Supp. 2d 233, 269 (D.D.C. 2012), aff'd sub nom. *Nat'l Sec. Couns. v. Cent. Intel. Agency*, 969 F.3d 406 (D.C. Cir. 2020). Note that the claimant in the GCLaws database is not necessarily the patient, so the race/gender of the plaintiff/claimant may or may not be the information Plaintiffs are seeking.

Since FOIA does not require agencies to conduct research or create new records for the benefit of FOIA requesters, and because the available aggregate medical malpractice lawsuit data was provided to Plaintiffs in full, VHA should be granted summary judgement on this request.

**B.** **VBA Conducted a Search Reasonably Calculated to Lead to the Discovery of Responsive Records.**

VBA has met the standard of a reasonable search beyond a material doubt as evidenced by 1) the FOIA Officer's outreach to the appropriate, internal offices, 2) the point of contacts' search methods, and 3) the submission of detailed declarations. Approximately nine days following the receipt of the initial FOIA request, the VBA FOIA Officer contacted an internal office, Compensation Services, to assist in request fulfillment. *See* Caines Decl. Exh. V ¶ 5. In addition to performing a search for records, the Compensation Services office further referred Plaintiffs' data request to the Office of Performance Analysis and Integrity (PA&I). Upon receipt, a PA&I data analyst searched for responsive records using his vast personal knowledge of VBA data, requests for data received by VBA and of VA databases. *See* Cunningham Decl. Exh. W ¶¶ 1, 5-6.

Specifically, the PA&I analyst searched "Beneficiary Identification Records Locator Subsystem (BIRLS), the VBA Corporate Database/VETSNET (the Veterans

Service Network), the Pending Issue File (PIF), the Compensation and Pension Master Record (CPMR), the latest available USVETS data as of fiscal year 2019, the VA/Department of Defense Identity Repository (VADIR), and the Veterans Appeals Control and Locator Systems (VACOLS) for the information." Cunningham Decl. Exh. W ¶¶ 9;21 (stating that the PA&I analyst searched known databases and used SQL to locate results). In addition, the both the VBA FOIA Officer and the PA&I analyst submitted comprehensive search declarations regarding the search process. *See Wood* 432 F.3d 78 at 85.

To extract data from the databases and tables, the analyst "wrote computer code, in this case SQL, that: listed the tables to be used, specified how records from each table must be joined together so that only matched or associated records were extracted, specified any conditions or limitations on the data to be extracted, and specified exactly what data fields were to be extracted." Cunningham Decl. Exh. W ¶ 23. The PA&I analyst further extrapolated the method to retrieve data, stating that he "wrote this code as a series of smaller steps that extract a small amount of data in each step and where each step then built on the prior step adding additional pieces of data from other tables."

In addition, under *NLRB*, PA&I has no obligation to "create explanatory material." 421 U.S. 132, 162 (1974). Although the PA&I analyst was able to provide *some* data regarding the requested "race" category, it was not always readily available, as race isn't a required field. Cunningham Decl. Exh. W ¶ 6 (stating "[w]here additional demographic data fields (such as gender, date of birth, race,

24

power of attorney, etc.) exist, they can be blank as they are not required for payment purposes. As a result, there are many records where the requested data is blank, and we can only report these records as unknown").

The creation of code and extensive searches across a myriad of databases shows that VBA satisfied the search standard "beyond a material doubt." As such, the search for VBA records, including the collection and compilation of statistical data, was beyond reasonable, and VA is entitled to summary judgment on this issue.

Similarly, VBA conducted an adequate search for records responsive to request #15, which sought internal analysis, review, or studies regarding racial disparities in service-connected disability compensation. The FOIA Officer handling the VBA requests had personal knowledge of VBA operations and the appropriate personnel within VBA business lines and staff offices to locate responsive records. Caines Decl. Exh. V ¶ 2. First, the officer directed VBA Compensation Service (CompSvc) staff to search for responsive records. He selected CompSvc based on his knowledge of their central role in disability claims processing and his belief that the office was the appropriate contact for the requested records. *Id.* ¶ 5. Compensation Service, the office overseeing disability compensation (the subject of request #15), advised the officer that its search revealed no records. CompSvc staff informed the officer that the office has not conducted studies on racial disparities in service-connected disability compensation. *Id.* ¶ 8. However, CompSvc staff recommended that the officer

contact the Office of Enterprise Integration (OEI) to perform an additional search, and the officer did so. *Id.* ¶¶ 8-9. OEI is a central office component that conducts strategic planning, enterprise integration and optimization, data analytics, and policy management in order to increase efficiency and improve outcomes across all of VA's functions. In response to the FOIA Officer, OEI advised that they had no responsive records for item 15. *Id.* ¶ 10. According to the FOIA Officer, he had directed the search for studies of racial disparity in disability compensation to the disability compensation office. Thereafter, having been referred to Enterprise Integration as a possible repository for responsive records, he directed them to search as well. Accordingly, the locations that, based on his expertise and experience, were likely to contain responsive material had been searched. *See* Caines Decl. Exh. V ¶¶ 5-10.

Thereafter, Compensation Services performed a subsequent search, confirming the prior "no records" for VBA item 15. The Acting Assistant Director, Policy Staff for Compensation Services reported that the VBA's Compensation Service H: Drive and SharePoint sites were searched. These locations were searched because they are the electronic document storage repositories where that office maintains and shares documents. Searches were conducted using the following keywords: race, ethnicity, ethnic, discrimination, ethnic group, identity, nationality, diversity, population, populace, skin color, ancestry, culture, xenophobic, black, white, indigenous, Asian, Hispanic. The keyword searches did

not identify any record responsive to VBA #15.  This establishes an adequate and reasonable search for the studies sought by VBA item #15.

C.      The Board Conducted a Search Reasonably Calculated to Lead
        to the Discovery of Responsive Records. (BVA #4 - #5)

The Board has similarly met the standard for an adequate search, as evidenced by the outreach and collaboration with multiple offices and the submission of detailed declarations.  On July 12, 2021, the Board FOIA Officer contacted an Information Technology Specialist regarding items 1-3 of the request. Charlebois Decl. Exh. Q ¶ 11.  In response to the "race" component, the Specialist stated that the Veterans Appeals Control and Locator System (VACOLS) database does not track the race of appellants. VACOLS is the appeals system that tracks legacy appeals at the Board. Wagner Decl. Exh. R ¶¶ 7, 10.

In addition, the Technical Infrastructure Branch Chief mirrored the Board's position regarding the absence of race in the Caseflow system, stating that "there is no data field the VA's appeals system of record that records the race of a veteran or claimant; therefore, there is no method to draw this information for a specific appeal." Gosnell Decl. Exh. S ¶ 9.

Per *NLRB* the Board is not required to create "explanatory material" regarding the race category. 421 U.S. 132 at 162. As argued above, the absence of this material does not equate to an unreasonable search.

The Board FOIA Officer further displayed an above-adequate search for records in response to item 4.  Upon identifying folders within the network drive most likely to have responsive records, the FOIA Officer opened and searched

eight folders and two hundred forty-six (246) subfolders contained within the eight main drive folders in order to personally access documents and verify responsiveness. Charlebois Decl. Exh. Q ¶ 22. The FOIA Officer spent approximately 16 hours searching the initial eight folders and approximately eight hours searching the subfolders. *Id.*

Through the multiple searches across various offices and detailed declarations, this was in fact a reasonable search, and summary judgment should be granted.

D. **ORMDI on Behalf of Both VHA and VBA Conducted a Search Reasonably Calculated to Lead to the Discovery of Training Records. (VBA #16, BVA #5, VHA #4)**

The ORDMI FOIA Officer contacted Employee Development and Training staff to search both ORDMI training and VA's Talent Management System (TMS) for responsive training records for VHA employees. Suppa Decl. Exh. K ¶ 20. The FOIA Officer also performed a search to verify ORMDI did not track employee training. *Id.* ¶ 24. This information also supplemented the response for item 16 of the VBA FOIA request.

In addition, the ORMDI FOIA Officer requested that approximately 26 ORMDI senior leaders, including herself, to search their ORMDI shared drives for investigations in which the senior leaders might have participated as consultants. For their search, the ORMDI FOIA Officer shared with the ORMDI senior leaders Plaintiffs' request which provided the criteria for the search as: "systemic, widespread, persistent, or pervasive racial discrimination at VHA health care facilities (including, but not limited to, medical centers, community-based

28

outpatient clinics, and Vet Centers) from 2001 to the present). Suppa Decl. Exh. K ¶ 17. The search of the ORMDI senior leaders yielded a 46- page document which was responsive to Plaintiffs' request. This document was ultimately processed by the VHA Central Office FOIA because the document was about allegations of discrimination at a VHA VISN. *Id.*

ORDMI conducted reasonable search for training records for VHA and VBA. In addition, ORMDI conducted a reasonable search for possible investigations and summary judgment should be granted.


## II. Defendant VA Properly Applied FOIA Exemption 5

Some pages of the records releases in response to BVA #4 were withheld due to deliberative process privilege. *See* Charlebois Decl. Exh. Q ¶ 31. A *Vaughn* index is attached to the Charlebois Declaration and sets forth the exemption basis for each document withheld either in full or in part.

Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges." *El Badrawi v. Department of Homeland Sec.*, 583 F. Supp. 2d 285, 317 (D. Conn. 2008) (citing *National Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005)).

The deliberative process privilege refers to records that are "(1) predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, i.e., actually . . . related to the process by which policies are formulated." *Id.* at 356. The court in *El Badrawi* further stated that records consisting of factual information and non-policy-oriented data, such as correspondence seeking advice on potential violations of law, do not fall under Exemption 5 unless agency policy typically arises from such communication.

In *El Badrawi*, the defendant invoked deliberative process to withhold "records consisting of correspondence and communications which, for example, discuss the existence of potential violations of law and seek advice and input regarding an investigation," and also, "drafts and unapproved documents, such as draft Significant Incident Reports that were not later expressly adopted or incorporated by reference into a final report." *El Badrawi*, 583 F. Supp. 2d 285 at 317 (citing ICE Mem. at 23.) The court in *El Badrawi* held that the deliberative process privilege application was flawed, as it failed to show correlation between the withheld information and policy formation. *See El Badrawi*, 583 F. Supp. 2d 285 at 318.

Here, unlike the defendant in *El Badrawi*, the withheld information directly influenced policy development, as final action stemmed from the documents' completion. The Board's Consultants' Report's concluded that upon review, there was no evidence of bias, either possible or patterned, against members of targeted

groups by named Veterans Law Judges. This written document stands as a policy decision following review of pre-decisional and deliberative material.

In addition, the case selection criteria is further protected under the work product doctrine. *See El Badrawi*, 583 F. Supp. 2d 285 at 318. The work product doctrine protects the "files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways prepared in anticipation of litigation." *Id.* (citing A. Michael's Piano v. Fed. Trade Comm'n, 18 F.3d 138, 146 (2d Cir. 1994)) (internal quotation omitted). The case selection criteria, included in the Consultant's report, further encouraged the creation of a policy decision.

III.    **Defendant VA Properly Applied FOIA Exemption 6 to Employee Names.**

Exemption 6, personal privacy, justifies the withholding of certain identifying information in some of the released documents. *See* Heim Decl. Exh. B ¶¶ 34-36 and *Vaughn* index; Charlebois Decl. Exh. Q ¶ 32 and *Vaughn* index; Parise Decl. Exh. T ¶ 9.

Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Wood v. F.B.I.,* 432 F.3d

78, 86 (2d Cir. 2005) (quoting *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599, 102 S. Ct. 1957, 72 L. Ed. 2d 358 (1982)). The first step of the inquiry is "not a difficult hurdle to clear, as the Second Circuit considers 'a record . . . a "similar file" if it contains personal information identifiable to a particular person.'" *Osen I*, 375 F. Supp. 3d 409, 423 (quoting *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 175 (2d Cir. 2014)).

At the second step, "[t]he balancing analysis for FOIA Exemption 6 requires that [courts] first determine whether disclosure of the files would compromise a substantial, as opposed to a *de minimis*, privacy interest, because if no substantial privacy interest is implicated FOIA demands disclosure." *Seife v. U.S. Dep't of State*, 366 F. Supp. 3d 592, 610 (S.D.N.Y. 2019) (quoting *Cook*, 758 F.3d at 175-76). However, "[t]he privacy interests protected by the exemptions to FOIA are broadly construed." *Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62, 65 (2d Cir. 2008). "Personal information, including a citizen's name, address, and criminal history, has been found to implicate a privacy interest cognizable under the FOIA exemptions." *Id.* "Where an agency has demonstrated a privacy interest sufficient to implicate Exemption 6, the burden falls to the requesting party to establish that disclosure 'would serve a public interest cognizable under FOIA.'" *Seife*, 366 F. Supp. 3d at 610 (quoting *Associated Press*, 549 F.3d at 66). "The only public interest found to be relevant in FOIA balancing is 'the extent to which disclosure would serve the core purpose of the FOIA, which is contribut[ing] significantly to public understanding of the operations or activities

of the government.'" *Associated Press*, 549 F.3d at 66 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495, 114 S. Ct. 1006, 127 L. Ed. 2d 325 (1994)).

"[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 47 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994)) (alterations in original); *Beck v. Dep't of Justice*, 997 F.2d 1489, 1492 (D.C. Cir. 1993) (quoting *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). "Information that 'reveals little or nothing about an agency's own conduct' does not further the statutory purpose." *Beck*, 997 F.2d at 1492.

In response to Plaintiffs' FOIA requests, the VA FOIA Officers involved in this litigation withheld the names of lower-level VA employees, consultants, and as well employee names found in the prefix of their direct VA email addresses. The VHA Central FOIA Officer correctly withheld the direct VA email addresses of those employees listed as points-of-contact in the list of TMS training courses provided to Plaintiffs in two separate releases of Excel spreadsheets. Heim, Decl. Exh. B ¶¶ 34-35. These points-of-contacts were those employees with administrative rights to upload the course listing information into TMS. VHA Central FOIA found these VA employees had a privacy interest from having their information publicly released possibly subjecting them to harassment while trying to carry out their

daily work assignments.  On the other hand, the VHA Central FOIA Officer could not identify a public interest which would outweigh the privacy interest of the VA employees whose emails she withheld.  In fact, the VHA Central FOIA Officer could not find any public interest as to how having the identities and direct contact information of VA employees serving as points-of-contacts would help Plaintiffs and the public understand VA operations. *Id*. Hart Decl. Exh. C ¶ 25. On appeal, Plaintiffs could point to none.  Lastly, the redaction of employee emails was the subject of an OGC memo widely dissemination across all VA FOIA Offices setting forth FOIA guidance which directed FOIA Officers to redact the entirety of names in VA email addresses.  *Update on Email Redactions under Freedom of Information Act (FOIA) Exemption (b)(6)*, Deputy General Counsel, General Law, Exhibit X (April 20, 2020).

Likewise, the Board's FOIA Officer, OSVA's FOIA Officer and ORMDI's FOIA Officer also properly withheld just the names of lower-level employees and/or consultants under Exemption 6 as lower-level VA employees with a privacy interest in being able to perform their official work duties free from harassment.  Charlebois Decl. Exhibit Q ¶ 30 Attachment 1; Parise Decl. Exh. T, ¶ 10, Attachment 1. Stephens Decl. Exh. O ¶ 6 Attachments 2 & 3.  As was the case with the VHA Central FOIA Officer, none of these other VA FOIA Officer were able to identify a public interest in how making public a few employee names would help them better understand the way VA conducts its business.  *See, e.g., Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 193 (2d Cir. 2012) (individual federal employee names properly withheld under

Exemption 6). Like the VHA Central FOIA Officer, these FOIA Officers also followed OGC guidance. *Update on Email Redactions under Freedom of Information Act (FOIA) Exemption (b)(6)*, Deputy General Counsel, General Law, ¶ 4 (April 20, 2020) (Exh. X).

Because FOIA Exemption 6 was applied correctly under FOIA, established case law and VA policy, we ask this court to grant Defendant VA summary judgment on this issue.

IV. **Defendant VA Properly Complied with FOIA's Segregability Requirement.**

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information subject to FOIA must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). After examining its records, Defendant VA determined the VHA Central Office FOIA Officer took steps to make a line-by-line review of all reasonably segregable non-exempt information regarding the training courses requested by Plaintiffs. This is shown by the fact the VHA Central FOIA Officer only withheld the email addresses which were personal to VA employees but released all email addresses which belonged to a group of individuals along with all other information in the EES TMS Excel spreadsheet listing VHA and VA training courses. Heim Decl. Exh. B ¶ 37. Similarly, the FOIA Officers for the Board, ORMDI, and OSVA also performed a line-by-line review, redacted a miniscule amount of information, under Exemptions 5 and 6, and released all other of their documents and information to Plaintiffs.

Charlebois Decl. Exh. Q ¶¶ 32-34; Stephens Decl. Exh. O ¶ 9; and Parise Decl. Exh. T ¶ 9.

### V.     There Are No Monetary Damages Or Fees Available To Plaintiffs

Even if Plaintiffs were to succeed in some of their claims, they are not entitled to monetary damages. *See* Complaint, Prayer for Relief, no. 5. First, "FOIA does not provide for damages for defendant's failure to produce documents." *Diamond v. FBI*, 532 F. Supp. 216, 233 (S.D.N.Y. 1981). Rather, "FOIA provides a mechanism through which the members of the public can request, and government agencies can provide governmental agency documents." *Warren v. Astrue*, No. 6:12-CV-00187, 2013 U.S. Dist. LEXIS 197442, at 4 (N.D.N.Y. June 102013) (quoting *Gasparutti v. United States*, 22 F. Supp. 2d 1114, 1116-17 (C.D. Cal. 1998)).

FOIA does provide, in part: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). The statute specifies that "a complainant has substantially prevailed if the complainant has obtained relief through either-- (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii).

In *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 600 (2001), however, the Supreme Court held that the term "prevailing party" did not include "a party that has failed to secure a

36

judgment on the merits or a court-ordered consent decree but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct."  The Second Circuit has determined "that the terms 'prevailing party' and 'substantially prevails' are fundamentally the same for purposes of determining whether a plaintiff can recover under a fee-shifting statute." *Preservation Coal. of Erie County v. Fed. Transit Admin*, 356 F.3d 444 (2d Cir. 2004).  As such, "*Buckhannon* precludes a fee award to a FOIA plaintiff whose 'lawsuit did not result in a judicially sanctioned change in the legal relationship of the parties.'" *Union of Needletrades, Indus. and Textile Employees, AFL-CIO, CLC v. United States I.N.S.,* 336 F.3d 200, 207 (2d Cir. 2003) (quoting *New York State Fed. of Taxi Drivers, Inc.,* 272 F.3d 154, 158-59).

In the instant case, Defendant provided all information requested by the Plaintiffs and obtained through its reasonable search of agency information without any "judicial sanctioned change in the legal relationship of the parties." Thus, if this Court determines that Plaintiffs should be awarded some form of relief, 5 U.S.C. § 552(a)(4)(B) authorizes only injunctive relief.

## CONCLUSION

Defendant VA conducted a search reasonably calculated to uncover all relevant documents in response to Plaintiffs' FOIA requests, applied the proper FOIA exemptions with the utmost restraint, and produced to Plaintiffs all documents, information or data found which was responsive to their requests.  For

the reasons articulated above, Defendant VA is entitled to summary judgment on

all claims in the Complaint.


                          Respectfully submitted,

                          LEONARD C BOYLE
                          UNITED STATES ATTORNEY

             By:     _Carolyn A. Ikari_____
                          CAROLYN A. IKARI
                          ASSISTANT UNITED STATES ATTORNEY
                          450 Main Street, Room 328
                          Hartford, Connecticut 06103
                          (860) 760-7953
                          Carolyn.ikari@usdoj.gov
                          Fed. Bar. No. ct13437